J-S30033-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DWIGHT WILLIAMS | |
| Appellant | No. 2319 EDA 2013 |

Appeal from the Judgment of Sentence May 6, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): CP-51-CR-0006351-2011

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED AUGUST 28, 2015**

A jury found Dwight Williams guilty of robbery,[1] conspiracy,[2] robbery of a motor vehicle,[3] and possession of an instrument of crime.[4] The trial court sentenced Williams to a total of 8½ - 17 years' imprisonment. Williams filed timely post-sentence motions, which the trial court denied, and a timely direct appeal. Both Williams and the trial court complied with Pa.R.A.P. 1925. We affirm.

The trial court accurately summarized the evidence as follows:

---

[1] 18 Pa.C.S. § 3701(a)(1)(ii).

[2] 18 Pa.C.S. § 903.

[3] 18 Pa.C.S. § 3702.

[4] 18 Pa.C.S. § 907.

On May 18, 2011, William Jackson drove his girlfriend Jessica Blair and her son to her home. Jackson was driving his milk-white, 1976 Chevrolet Impala, which was customized with distinctively large 26" tires and rims. When Jackson pulled up to Blair's home at 1379 Narragansett Street in Philadelphia, he double-parked his vehicle and walked Blair and her son to the front door. Blair and Jackson talked on the porch for several minutes. During their conversation, Jackson noticed two men — defendant Scott and co-defendant Williams — walking down the street. Williams and Scott stopped walking when they reached Jackson's car, and then stood there talking for approximately five minutes. They were approximately ten to fifteen feet from Jackson, who was on the porch. Jackson ended his conversation with Blair and then walked down the porch steps toward his vehicle.

As soon as Jackson reached the bottom of the steps, [] Williams approached Jackson and pulled out a black and silver semi-automatic handgun. [] Scott followed close behind. Williams pointed the gun in Jackson's face and told him to get on the ground, lay face-down on his stomach, and hand over his money. Jackson complied by [lying] on the ground. Williams then put the gun to the center of the back of Jackson's head. [] Scott was standing directly behind Williams. Williams removed a wallet from Jackson's back pocket, and told [] Scott to jump in Jackson's car and drive off. [Scott] stepped over Jackson, entered Jackson's vehicle, and drove toward Stenton Avenue. Even though he was [lying] on the ground, Jackson observed [Scott] drive Jackon's Impala down Narragansett Street and turn right onto Stenton Avenue. [] Williams told Jackson not to move. Williams then walked away in the same direction as [] Scott, and then turned right on Stenton Avenue.

After [] Williams walked away, Jackson got up off the sidewalk and walked inside Blair's house. Once he entered the house, Jackson called police using Blair's phone; the police arrived a few minutes later.

Jackson provided descriptions of both men: 'the one gentleman with the gun had on a dark gray hoodie and dark pants, light-skinned, goatee, kind of stocky. The other person that drove off in the vehicle was dark-skinned, slim, maybe a little bit taller.' Jackson testified that he remembered the faces 'very well' and that there were several street and porch lights on in the area. Police conveyed over police radio the descriptions of both defendants and a description of the stolen car.

Sergeant Daniel Ayres and Officer Michael Bransfield were responding to the police radio call when they passed Jackson's distinctive Impala two blocks away from the scene of the crime at the corner of Crittenden and Price. The officers observed the Impala parked poorly, with the headlights and interior lights left on, and the keys on the ground in the middle of the street outside of the driver's side door. [] Scott was near the Impala walking away from the driver's side door of the car. The Officers stopped [Scott] for investigation pending identification by Jackson.

Officers Justin O'Brien and Fred MacConnell stopped [] Williams on the 6500 block of Wister Street, just one block from the scene of the crime. Williams was walking down Wister Street looking over his shoulder. When the Officers turned their car around, Williams had stopped walking and was now sitting on the steps of a house along Wister Street. Williams claimed that he lived there when asked by Officer O'Brien, but he did not know the address of the house or the name of the street. The Officers held Williams for investigation pending identification by Jackson. Officers Brandon Bryant and Kevin Cahill transported Jackson to a total of three locations to make possible identifications. At the first location, Jackson identified the Impala stopped by Officers O'Brien and MacConnell as his customized Impala. He then positively identified [] Scott as the individual who stole his Impala. Jackson testified that [Scott]'s facial hair stood out, and he remembered 'his face, dark skin, his height, his stature, even the clothing

- 3 -

he had on.' At the second location, Jackson was provided the opportunity to make an identification of someone the police had stopped in the area. Jackson told the officers that this second person was not involved in the robbery. Jackson was then taken to a third location, where he identified [] Williams as the gunman who pointed the gun at his head and took his wallet. Jackson testified that he would not forget Williams's face and stature. Approximately ten minutes passed from the time he was robbed until he identified [] Scott and Williams. Jackson testified that he had no doubt about his identifications of [] Scott and Williams and that he would never forget the day that he was robbed.

Pa.R.A.P. 1925(a) Opinion, at 1-4 (citations omitted).

Williams raises three issues in this appeal:

Is the appellant entitled to an arrest of judgment with regard to his conviction[s] for robbery, robbery of a motor vehicle, criminal conspiracy and possessing instruments of crime since the Commonwealth failed to sustain its burden of proving the appellant's guilt of [these crimes] beyond a reasonable doubt?

Is the appellant entitled to a new trial with regard to his conviction[s] for robbery, robbery of a motor vehicle, criminal conspiracy and possessing instrument of crime since the verdicts of guilt are against the weight of the evidence?

Is the appellant entitled to a new trial since the trial court erred when it denied his pretrial motion to suppress?

Brief For Appellant, at 5.

Williams' first argument is a challenge to the sufficiency of the evidence. Our standard of review for such challenges is well-settled:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 716 (Pa.Super.2015).

We begin by defining the relevant offenses. The robbery statute provides in relevant part that "a person is guilty of robbery if, in the course of committing a theft, he: … threatens another with or intentionally puts him in fear of immediate serious bodily injury." 18 Pa.C.S. § 3701(a)(1)(ii). In addition, an individual is guilty of robbery of a motor vehicle "if he steals or takes a motor vehicle from another person in the presence of that person or any other person in lawful possession of the motor vehicle." 18 Pa.C.S. § 3702. A person is guilty of conspiracy with another person to commit a crime if, "with the intent of promoting or facilitating its commission he … agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime …" 18 Pa.C.S. § 903(a)(1). Finally, a

- 5 -

person is guilty of possession of an instrument of crime "if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). An instrument of crime is "(1) anything specially made or specially adapted for criminal use [or] (2) anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S. § 907(d).

Williams argues that the Commonwealth failed to prove Williams' identity as the perpetrator of these crimes. The evidence discussed above – consisting of Jackson's positive identifications of Williams and Scott, Williams' possession of a weapon during the incident, and Williams' untruthfulness when confronted by the police, demonstrating his consciousness of guilt – was plainly sufficient to prove Williams' identity as one of the robbers. *See Commonwealth v. Ragan*, 645 A.2d 811, 818 (Pa.1994) (eyewitness testimony identifying defendant as shooter "was clearly sufficient" to sustain his conviction); *Commonwealth v. Donnelly*, 653 A.2d 35, 37 (Pa.Super. 1995) ("fabrication of false and contradictory statements by the accused is evidence from which a jury may infer that they were made with the intent to mislead police and are indicative of guilt"); *Commonwealth v. Thomas*, 539 A.2d 829, 831 (Pa.Super.1988) (single witness's positive identification of appellant sufficient to establish his identity as the robber).

Williams argues that "the Commonwealth did not present any physical or scientific evidence in an attempt to connect [him] to the crime," and

"[a]bsolutely no physical evidence was presented to corroborate Jackson's account of the incident." Brief for Appellant, at 26. The Commonwealth was not required to present any physical or scientific evidence connecting Williams to the crime, because "it is settled that a positive identification by one witness is sufficient for conviction." *Commonwealth v. Wilder*, 393 A.2d 927, 928 (Pa.Super.1978). Williams also points out that Jackson's girlfriend, Jessica Blair, did not make any identification of the robbers. The Commonwealth, however, was not required to present any evidence to corroborate Jackson's testimony, because corroboration is not required of testimony found credible by the fact finder. *See Commonwealth v. Connelly*, 689 A.2d 950, 953 (Pa.Super.1997) (uncorroborated testimony of prosecution witnesses may alone be sufficient to convict if credited by fact finder). Jackson's positive identifications of Wlliams as one of his assailants was sufficient, by itself, to prove Williams' guilt for robbery. Thus, Williams' challenge to the sufficiency of the evidence fails.

In his second argument on appeal, Williams contends that he is entitled to a new trial because the verdict is contrary to the weight of the evidence. The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Forbes*, 867 A.2d 1268, 1273–74 (Pa.Super.2005). A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation

than a reassessment of the credibility of witnesses. ***Commonwealth v. Bruce***, 916 A.2d 657, 665 (2007). Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. ***Id.*** On appeal, "our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence." ***Commonwealth v. Knox***, 50 A.3d 732, 738 (Pa.Super.2012). An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. ***Forbes***, 867 A.2d at 1273–74.

Williams bases his challenge to the weight of the evidence on discrepancies between Jackson's testimony and the testimony of Jackson's girlfriend, Jessica Blair. According to Williams, Jackson's identification of the scene of the robbery as well-lit was undermined by Blair's inability to identify either perpetrator. Williams also emphasizes that Blair was sure that Scott had a chipped tooth when in fact he did not. These details certainly were fodder for closing argument, but the jury remained free to credit Jackson's account of the events and to return a guilty verdict on this basis. The trial

court acted within its discretion by denying Williams' challenge to the weight of the evidence.

In his final argument on appeal, Williams contends that the trial court improperly denied his motion to suppress, because the police stopped him on the street without reasonable suspicion and the out-of-court identification procedure was overly suggestive. The standard of review in an appeal from an order denying a motion to suppress is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa.2010).

We first address whether the police had reasonable suspicion to stop Williams on the street. "It is well established that the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution allow a police officer to conduct a brief investigatory stop of an individual if the officer has reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot." *In re C.C.*, 780 A.2d 696, 698 (Pa.Super.2001). To determine whether reasonable suspicion

existed, the court must examine the totality of the circumstances, and the officer must be able to articulate specific facts that, together with reasonable inferences drawn from those facts, led him to reasonably conclude, in light of his experience, that criminal activity was afoot. ***Commonwealth v. Daniels***, 999 A.2d 590, 597 (Pa.Super.2010). The court should consider the specificity of the identification information provided to the authorities "in conjunction with the offense reported to have been committed, the proximity of the crime to the sighting of the suspect and the time when, as well as the place where, the confrontation occurs." ***Commonwealth v. Whelton***, 465 A.2d 1043, 1047 n.4 (Pa.Super.1983). Also, "[w]hen evaluating the totality of circumstances comprising reasonable suspicion … this Court will not ignore the ability of experienced police officers to draw deductions and inferences which other persons might not make." ***In Interest of B.C.***, 683 A.2d 919, 924 (Pa.Super.1996). Reasonable suspicion is a relatively low standard. Thus, "[t]he fact that a suspect's behavior may be consistent with innocent behavior does not, standing alone, make detention and limited investigation illegal." ***Commonwealth v. Johnson***, 734 A.2d 864, 869 (Pa.Super.1999).

Here, the evidence presented at the suppression hearing established that at approximately 10:40 p.m., Williams and Scott confronted the victim, Jackson, on the street in front of his girlfriend's house. Pointing a gun at Jackson's head, Williams forced him to the ground and removed his wallet

from his pocket. Williams told Scott to drive off in Jackson's car and then walked away in the same direction in which Scott had driven. N.T. 2/4/13, 13-22.

After Williams and Scott left, Jackson went inside his girlfriend's house and telephoned the police. Jackson told the police what had happened and provided descriptions of Williams and Scott. Police radio broadcasted that there had been a gunpoint carjacking, described the stolen car as a 1979 white Chevy Impala, and described the robbers as two black males, one wearing a black "hoodie," the other wearing a gray "hoodie." Officers responding to the broadcast quickly located the car haphazardly parked on a nearby street with its headlights still on. Scott, who was wearing a black hoodie, was walking away from the vehicle when officers stopped him for investigation. The police transported Jackson to the scene, and he identified the car as being his and Scott as being the person who accompanied Williams during the robbery and drove off in his vehicle. N.T., 2/4/13, at 23, 44-54.

Other police officers responding to the radio broadcast quickly located Williams walking at a fast pace down the 6500 block of Wister Street, in the same area where the robbery occurred. Williams was wearing a white T-shirt, and the officers believed that he fit the description of one of the robbers and had possibly taken his hoodie off. When the officers made a U-turn to approach Williams, he sat down on the steps of one of the houses on

the block. The officers exited their car and asked Williams if he lived there, and he said yes. They asked him what the address was, but he did not know and turned around in an apparent attempt to learn what it was. One of the officers asked Williams if he knew the name of the street, and he was unable to tell them. The officers asked him again if he lived there. This time, he admitted he did not. Besides lying to the officers, Williams also acted nervously throughout the encounter. N.T., 2/4/13, at 26, 36, 54-61.

This evidence provided reasonable suspicion to believe that Williams may have been one of the robbers. *See Commonwealth v. Williams*, 73 A.3d 609, 616 (Pa.Super.2013) (reasonable suspicion existed because defendant lied to officer who approached him on the street and gave officer false name); *Commonwealth v. Clemens*, 66 A.3d 373, 380 (Pa.Super.2013) (reasonable suspicion existed to detain defendant for investigation because, among other things, when he spotted the police, he ran onto the porch of nearby house, pretended to read a newspaper, and when questioned by officer, admitted that he did not live at that address); *Commonwealth v. Guess*, 53 A.2d 895, 901-02 (Pa.Super.2012) (reasonable suspicion existed to detain defendant because he and his companion matched general description of suspected burglars, they were found near where the crimes occurred, defendant appeared nervous when approached by police, and he claimed to be in the area to visit a friend but

did not provide friend's name when asked). Therefore, Williams' stop on the street was proper.

We next consider whether the trial court properly denied Williams' motion to suppress his out of court identification. A trial court should evaluate the totality of the circumstances when reviewing a motion to suppress an out of court identification. *Commonwealth v. Freeman*, 827 A.2d 385 (Pa.2003). Although suggestiveness in the identification process is relevant, "suggestiveness alone does not warrant exclusion." *Commonwealth v. Fulmore*, 25 A.3d 340, 346 (Pa.Super.2011). The court must also examine the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. *Commonwealth v. Wade*, 33 A.3d 108, 114 (Pa.Super.2011). The court must weigh these factors against the corrupting effect of any suggestiveness. *Id*. The court should not suppress identification evidence unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Fulmore*, 25 A.3d at 346.

The purpose of a "one on one" identification is to enhance reliability by reducing the time elapsed after the commission of the crime. *Wade*, 33

A.3d at 114. Absent some special element of unfairness, a prompt "one on one" identification is not so suggestive as to give rise to an irreparable likelihood of misidentification. *Id*.

In this case, there was no special element of unfairness that rendered the one-on-one confrontation unduly suggestive. The evidence at the suppression hearing established that Jackson had a good opportunity to observe Williams prior to and at the time of the crime. Jackson was standing on his girlfriend's porch when he saw Scott and Williams walk down the street in his direction. Scott and Williams stopped near where Jackson had parked his car, within ten feet of where Jackson was standing. For the next ten minutes, Scott and Williams stood there while Jackson continued to speak with his girlfriend. Although it was nighttime, there was lighting from street lights and the porch light. N.T. 2/4/13, at 15-17, 29.

After ten minutes passed, Jackson stepped off of his girlfriend's porch and walked toward his car. Scott and Williams confronted him, and Jackson had a face-to-face view of Scott for approximately one minute. Williams pointed a gun at Jackson and told him to get onto the ground. Williams asked Jackson for his money and his wallet. As Jackson lay on the ground, he was only a few feet from Scott and could see his face. Eventually, Williams told Scott to get into Jackson's car and drive away. Williams then walked away. Jackson explained that a number of minutes passed from the time that Scott and Williams confronted him on the street until Scott finally

drove off. During the encounter, Jackson had ample opportunity to observe Williams and saw that he had a goatee, was light-skinned and approximately six-feet tall, and was wearing a gray "hoodie" and dark pants. N.T. 2/4/13, at 16-22, 38. Jackson's observations during the robbery were at least as reliable as other cases in which we have found the victim's observations reliable. *See*, *e.g.*, *McElrath v. Commonwealth*, 592 A.2d 740, 743 (Pa.Super.1991) (victim had sufficient opportunity to observe appellant so as to make reliable out-of-court identification even though she observed him for only five seconds); *Commonwealth v. Bell*, 562 A.2d 849, 851-52 (Pa.Super.1989) (victim had sufficient opportunity to observe appellant and make out-of-court identification even though he observed him only in silhouette for a few seconds).

Nor was anything at the scene of Scott's arrest improperly suggestive. After the robbery, Jackson telephoned the police, who arrived within a matter of minutes. Police officers immediately transported Jackson a couple of blocks away to where they had stopped Scott. Scott was *not* handcuffed but was sitting inside a police car. Jackson positively identified Scott as the person who had driven away in his car. Jackson clearly remembered Scott's face from the robbery and had no doubt "at all" about his identification, which took place just a few minutes after the robbery. N.T. 2/4/13, at 23-26, 36, 41, 47-48, 52-53. The police then drove Jackson to another individual (not Scott or Williams) that they had stopped. Jackson stated that

this person was *not* involved in the robbery, demonstrating that he was not simply identifying anyone whom the police presented to him. Finally, the police drove Jackson to a third location, where they had stopped Williams. There, Jackson positively identified Williams as the gunman because he remembered Williams' face, goatee, and "whole stature." Jackson was "[o]ne-hundred percent" certain that Williams was one of the robbers. His identification of defendant took place just a few minutes after the robbery occurred. N.T., 2/4/13, at 26-28, 43, 56-58, 62-64. This evidence is at least as sturdy as other decisions in which we held that the identification of suspects in custody was admissible. *See Commonwealth v. Moye*, 836 A.2d 973, 976-78 (Pa.Super.2003) (identification was not unduly suggestive, even though it took place while defendant was handcuffed and was lone person inside police van, and even though prior to the identification, police told witnesses whose house had just been burglarized that they had person for witnesses to identify who had been found running down the street looking sweaty and tired); *Commonwealth v. Brown*, 611 A.2d 1318, 1320-21 (Pa.Super.1992) (victim's identification of defendant at hospital less than two hours after assault not impermissibly suggestive, even though victim saw weapon used in the crime prior to making identification and defendant was in handcuffs at time of identification); *McElrath*, 592 A.2d at 742-43 (victim's one-on-one identification of defendant who was in police custody not unduly suggestive, even though the victim noticed defendant's

gun before focusing on his face at identification procedure, where victim had observed defendant for approximately five seconds during crime and made identification within thirty minutes of incident); **Bell**, 562 A.2d at 851-52 (victim's one-on-one out-of-court identification not impermissibly suggestive, even though defendant was handcuffed in back of police van and victim had not gotten good look at his attacker); **Commonwealth v. Walker**, 501 A.2d 1143, 1149-50 (Pa.Super.1985) (robbery victim's one-on-one identification of defendant fifteen minutes after crime and while defendant was in custody not unduly suggestive).

Williams claims that Jackson's identification of him was suggestive because, at the time Jackson identified him, he was not wearing a gray hoodie, as Jackson had described earlier, and was not in possession of a gun or any proceeds of the robbery. Williams ignores, however, that Jackson was able to identify Williams based on his face, goatee and "whole stature". A detailed "facial identification is the strongest identification testimony." **Commonwealth v. Smith**, 423 A.2d 1296, 1299 (Pa.Super.1981). Moreover, Jackson had a lengthy opportunity to view Williams during the robbery. We see nothing overly suggestive about Williams' identification. Indeed, the record indicates that Jackson's identification of Williams was quite reliable, given his refusal to identify the second person stopped by police as one of the perpetrators.

For these reasons, the trial court properly denied Williams' motion to suppress.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/28/2015